# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

PAMELA J. PRICE                         :

              Plaintiff,         Case No. 3:07CV00370

  -vs-

                                     District Judge Walter H. Rice

MICHAEL J. ASTRUE,                      Chief Magistrate Judge Michael R. Merz
COMMISSIONER OF
SOCIAL SECURITY,

              Defendant.         :

## REPORT AND RECOMMENDATIONS

       Plaintiff brought this action pursuant to 42 U.S.C. §405(g) and 42 U.S.C. §1381(c)(3) as it incorporates §405(g), for judicial review of the final decision of Defendant Commissioner of Social Security (the "Commissioner") denying Plaintiff's application for Social Security benefits. The case is now before the Court for decision after briefing by the parties directed to the record as a whole.

       Judicial review of the Commissioner's decision is limited in scope by the statute which permits judicial review, 42 U.S.C. §405(g).  The Court's sole function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision.  The Commissioner's findings must be affirmed if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971), *citing, Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *Landsaw v. Secretary of Health and Human Services*, 803 F.2d 211, 213 (6th Cir. 1986).  Substantial evidence

is more than a mere scintilla, but only so much as would be required to prevent a directed verdict (now judgment as a matter of law), against the Commissioner if this case were being tried to a jury. *Foster v. Bowen*, 853 F.2d 483, 486 (6th Cir. 1988);  *NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300 (1939).

In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole. *Hepner v. Mathews*, 574 F.2d 359 (6th Cir. 1978);  *Houston v. Secretary of Health and Human Services*, 736 F.2d 365  (6th Cir. 1984);  *Garner v. Heckler*, 745 F.2d 383 (6th Cir. 1984).  However, the Court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility.  *Garner, supra.*  If the Commissioner's decision is supported by substantial evidence, it must be affirmed even if the Court as a trier of fact would have arrived at a different conclusion.  *Elkins v. Secretary of Health and Human Services*, 658 F.2d  437, 439 (6th Cir. 1981).

To qualify for disability insurance benefits (SSD), a claimant must meet certain insured status requirements, be under age sixty-five, file an application for such benefits, and be under a disability as defined in the Social Security Act, 42 U.S.C. § 423. To establish disability, a claimant must prove that he or she suffers from a medically determinable physical or mental impairment that can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §423(d)(1)(A).  Secondly, these impairments must render the claimant unable to engage in the claimant's previous work or in any other substantial gainful employment which exists in the national economy.  42 U.S.C. §423(d)(2).

To qualify for supplemental security benefits (SSI), a claimant must file an application and be an "eligible individual" as defined in the Social Security Act.  42 U.S.C. §1381a.

With respect to the present case, eligibility is dependent upon disability, income, and other financial resources. 42 U.S.C. §1382(a). To establish disability, a claimant must show that the claimant is suffering from a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §1382c(a)(A). A claimant must also show that the impairment precludes performance of the claimant's former job or any other substantial gainful work which exists in the national economy in significant numbers. 42 U.S.C. §1382c(a)(3)(B). Regardless of the actual or alleged onset of disability, an SSI claimant is not entitled to SSI benefits prior to the date that the claimant files an SSI application. *See,* 20 C.F.R. §416.335.

The Commissioner has established a sequential evaluation process for disability determinations. 20 C.F.R. §404.1520 . First, if the claimant is currently engaged in substantial gainful activity, the claimant is found not disabled. Second, if the claimant is not presently engaged in substantial gainful activity, the Commissioner determines if the claimant has a severe impairment or impairments; if not, the claimant is found not disabled. Third, if the claimant has a severe impairment, it is compared with the Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1 (1990). If the impairment is listed or is medically equivalent to a listed impairment, the claimant is found disabled and benefits are awarded. 20 C.F.R. §404.1520(d). Fourth, if the claimant's impairments do not meet or equal a listed impairment, the Commissioner determines if the impairments prevent the claimant from returning to his regular previous employment; if not, the claimant is found not disabled. Fifth, if the claimant is unable to return to his regular previous employment, he has established a *prima facie* case of disability and the burden of proof shifts to the

Commissioner to show that there is work which exists in significant numbers in the national economy which the claimant can perform. *Bowen v. Yuckert,* 482 U.S. 137, 145, n.5 (1987).

Plaintiff filed applications for SSI and SSD in August and September, 2003, alleging disability from January 23, 2001, (Tr. 87-91), due to migraine headaches, neck pain, back pain, dizziness, and pains in her head. (Tr. 87-91; 507-09; 99). Plaintiff's applications were denied initially and on reconsideration. (Tr. 70-73, 75-77; 510, 515). A hearing was held before Administrative Law Judge Melvin Padilla, (Tr. 39-67), who determined that Plaintiff is not disabled. (Tr. 18-32). The Appeals Counsel denied Plaintiff's request for review, (Tr. 7-9), and Judge Padilla's decision became the Commissioner's final decision.

In determining that Plaintiff is not disabled, Judge Padilla found that Plaintiff has severe vascular headaches, a history of polysubstance abuse, depression, and a pain disorder, but that she does not have an impairment or combination of impairments that meets or equals the Listings. (Tr. 23, ¶ 3; Tr. 25, ¶ 4). Judge Padilla also found that Plaintiff has the residual functional capacity to perform a limited range of medium work. (Tr. 26, ¶ 5). Judge Padilla then used sections 203.28 through 203.31 of the Grid as a framework for deciding, coupled with a vocational expert's testimony, and concluded that there is a significant number of jobs in the economy that Plaintiff is capable of performing. (Tr. 31-32, ¶ 10). Judge Padilla concluded that Plaintiff is not disabled and therefore not entitled to benefits under the Act. (Tr. 32, ¶ 11).

On January 22, 2001, Plaintiff sustained a work-related injury when she was hit in the head by a piece of wood that was expelled from a trash compactor. (Tr. 147-49). Plaintiff was treated in an emergency room and discharged with the diagnoses of head concussion and cervical strain. *Id.* A CT of Plaintiff's head performed on January 24, 2001 was normal. (Tr. 150-51). A

CT of Plaintiff's cervical spine taken March 6, 2001, showed no significant abnormality. (Tr. 153).

Plaintiff was in involved in a motor vehicle accident on April 11, 2001, and she was treated in an emergency room for complaints of right-sided low back pain, neck pain and scapular pain. (Tr. 154-55). Plaintiff's cervical spine and lumbar spine x-rays were all within normal limits. *Id.*

An April 14, 2001, MRI of Plaintiff's cervical spine revealed a broad based posterior disc protrusion at C5-6 level with sequestered slight ventral cord contract in the midline and slight narrowing of the left lateral recess and neural foramen. (Tr. 156-57). That MRI also revealed several scattered subcortical white matter lesions suggestive of small vessel ischemic changes that tended to accumulate with aging, though they were somewhat accentuated for Plaintiff at age forty. *Id.* Alternate considerations included vasculitis, lyme disease, demyelinating disease, or migraine disorder. *Id.*

Over time, Plaintiff has received emergency room treatment for complaints of nausea, left-sided neck pain, arm pain, and chest pain, (Tr. 170-73), abdominal pain, (Tr. 177-79), elbow pain, (Tr. 194-96), headache, (Tr. 226-28; 445), nervousness, headache, and depression, (Tr. 60-62), nervousness and nausea, (Tr. 304-06), nausea, (Tr. 307-15), dizziness and chest pain, (Tr. 316-27), and a laceration to her right thumb, (Tr. 436-49).

Consulting physician Dr. Smith reported on November 26, 2001, that following her industrial accident, Plaintiff continued to complain of headaches. (Tr. 174-76). Dr. Smith reported that Plaintiff had diffuse tenderness to palpation over the cervical neck and occipital and trapezius muscles which was aggravated by flexion, extension, and lateral rotation of the neck. *Id.* Dr. Smith noted that Plaintiff's neurological examination was negative. *Id.*

5

Plaintiff received chiropractic treatment during the period May 20-September 18, 2003, for her cervical and lumbar spine complaints. (Tr. 208-10).

A September 13, 2003, MRI of Plaintiff's cervical spine revealed a mild protrusion of the disc at C4-5 without evidence of central canal stenosis and a disc osteophyte complex at C5-6 which showed no evidence of central canal stenosis or neural foraminal encroachment. (Tr. 206). An MRI of Plaintiff's brain performed on that same date revealed scattered white matter hyperdensities most likely related to small vessel ischemic disease. (Tr. 207).

During the period September, 2001, to September, 2003, Plaintiff received treatment from Dr. Bowlin for various conditions including headaches, migraine headaches, bipolar depression, abdominal pain, dyspnea, back pain, nervousness, depression, anxiety, bronchitis, general myalgias and arthralgias, and neck pain. (Tr. 211-225).

Examining psychologist Dr. Boerger reported on November 19, 2003, that Plaintiff graduated from high school, appeared to be preoccupied with limitations associated with her head injury and headaches, had a subdued affect, and that she complained of depression for the past year. (Tr. 238-43). Dr. Boerger also reported that Plaintiff complained of problems with anxiety, was alert and oriented, and that she appeared to be aware of her health and emotional problems. *Id.* Dr. Boerger identified Plaintiff's diagnoses as depressive disorder NOS and anxiety disorder NOS; he assigned her a GAF of 60. *Id.* Dr. Boerger opined that Plaintiff's ability to relate to others was mildly impaired as a result of depression and anxiety, her ability to understand and follow instructions was mildly to moderately impaired as a result of some memory and concentration problems associated with the depression and anxiety, her ability to maintain attention to perform simple, repetitive tasks was mildly impaired, and that her ability to withstand the stress and

pressures associated with day-to-day work activity was mildly to moderately impaired as a result of depression and anxiety. *Id.*

Plaintiff was hospitalized December 16-23, 2003, for treatment of depression. (Tr. 263-73). During that hospitalization, it was noted that Plaintiff was in mild benzodiazepine withdrawal. *Id.* Pychiatrist Dr. Pan noted that Plaintiff was extremely somatic, depressed, negative, anxious, helpless, and hopeless and that she was alert and oriented. *Id.* Plaintiff participated in therapy, was treated with medications and Dr. Pan reported that Plaintiff had made some improvement in terms of her anxiety and depression but that she was discharged against medical advice because she felt her physical symptoms needed immediate attention and she did not want to stay any longer for stabilization. *Id.* Plaintiff's diagnoses were major depression, single episode, and generalized anxiety disorder. *Id.* Plaintiff was again hospitalized December 24-26, 2003, for treatment of depression. (Tr. 282-303).

Examining neuropsychologist Dr. Smith reported on May 5, 2004, that Plaintiff started having anxiety attacks after her January, 2001, work-related injury, that she has headaches almost every day since the injury, that she graduated from high school, and that she once abused cannabis and alcohol but that she had not abused either for the past 13 years. (Tr. 333-44). Dr. Smith also reported that Plaintiff had been hospitalized for psychiatric treatment, received outpatient counseling, was pleasant and cooperative, exerted full effort on all testing tasks, work dark glasses during parts of the evaluation, and that she reported that her mood was depressed, anxious, and frustrated. *Id.* Dr. Smith noted that Plaintiff's affect was flat, her psychomotor rate was slowed, her verbal IQ was 95, her performance IQ was 106, her full scale IQ was 100, and that she was alert and oriented. *Id.* Dr. Smith also noted that Plaintiff's intellectual functioning was in the average range,

that she showed significant impairment in the area of processing speed and evidenced impairment in the area of learning and memory for new information. *Id.* Dr. Smith determined that Plaintiff's diagnoses were cognitive disorder NOS, adjustment disorder NOS, anxiety disorder NOS, and pain disorder associated with both psychological factors and headaches. *Id.*

Consulting neurologist Dr. Udrea reported on July 28, 2004, that Plaintiff's symptoms were mostly head pressure, head and neck pain, and decreased concentration, she was alert and oriented, had subjective diminished sensation to light touch, temperature, and pinprick over the right side of her face, right arm, and right leg, and that her gait and reflexes were normal. (Tr. 346-48). Dr. Udrea also reported that Plaintiff's diagnoses were post-concussion syndrome, cervical sprain and strain, headache associated with the post-concussion syndrome, and anxiety associated with the post-concussion syndrome. *Id.* Dr. Udrea recommended physical therapy and follow-up with her psychiatrist. *Id.*

Dr. Studebaker began treating Plaintiff in January, 2004. (Tr. 349-74). Dr. Studebaker reported on August 25, 2004, that Plaintiff had chronic post-traumatic/post-concussion headaches of a moderate to severe nature, that she had not found sufficient relief to allow her to carry on a day's work which would require certain levels of concentration or any sustained physical stamina, that her anxiety had improved dramatically over time, that at times, he (Dr. Studebaker) would have "judged her anxiety to render her incapable of any gainful employment" but that he would not necessarily say that was true at the present time, and that considering his bias that everyone should work at whatever level they are capable, he would consider her able to work. (Tr. 349-50). Dr. Studebaker also reported that if Plaintiff was applying for disability she would consider

her own conditions to be completely disabling but that there were no objective measures that he could provide that could support her assertion. *Id.*

Plaintiff received mental health treatment from Dr. Ashbaugh, a psychiatrist, during the period January through June, 2004. (Tr. 375-403). At the time of Plaintiff's initial visit, Dr. Ashbaugh noted that he had treated Plaintiff during the period 1997 through 1999 and that she had a history of psychiatric hospitalizations. *Id.* Dr. Ashbaugh also noted that Plaintiff complained of anxiety and worry, graduated from high school, was rather fidgety, alert and oriented, and that she appeared to be of average intelligence. *Id.* Dr. Ashbaugh reported that Plaintiff's mood was "miserable", her affect was anxious and sad, and that her diagnosis was major depression, recurrent, and moderate and generalized anxiety disorder. *Id.* Dr. Ashbaugh assigned Plaintiff a GAF of 49, and prescribed medication. *Id.*

Plaintiff continued to receive mental health treatment from Dr. Ashbaugh during the period September, 2004, to March 7, 2005. (Tr. 414-16).

During the period March, 2003, to April, 2005, Plaintiff consulted with neurologist Dr. Kitchener. (Tr. 417-25; 345). On October 23, 2003, Dr. Kitchener reported that Plaintiff's EEG was normal. (Tr. 417-25). On July 27, 2004, Dr. Kitchener reported that Plaintiff had posttraumatic headaches, that medications had given her little relief, and that she had significant tenderness in the paracervical and shoulder muscles. (Tr. 345). Dr. Kitchener also reported that some of the characteristics of Plaintiff's headaches appeared to be vascular in nature and that an evaluation by Dr. Smith indicated that Plaintiff had issues related to adjustment and anxiety disorder. *Id.* Dr. Kitchener noted on April 6, 2005, that Plaintiff had intractable migraine headaches, that he (Dr. Kitchener) believed that some of the headaches were rebound headaches because of analgesics, and

9

that preventive and abortive medications had provided little relief. (Tr. 417). Dr. Kichener reported on January 20, 2006, that there was no change in Plaintiff's neurological status, that she continued to complain of waxing and waning headaches, and that DHE protocol, [see *infra*],did not help her. (Tr. 485).  Dr. Kichener also reported that Plaintiff had headaches that were not responding to various modalities of treatment.  *Id.*

An MRI of Plaintiff's brain performed on March 1, 2006, revealed multiple white matter hyper-intensities bilaterally suspicious for demyelinating disease and which had increased significantly in number since the last MRI.  (Tr. 494-95).  A MRI of Plaintiff's cervical spine performed on that same date revealed a left diffuse bulge at the C5-6 level which was causing mild neural foraminal narrowing on the left but which had not significantly changed since the last study. (Tr. 496-97).

In October 2005, Plaintiff was hospitalized for the DHE protocol, in an effort to treat her headaches.  (Tr. 449-66; see also, Tr. 449-66).

Plaintiff was evaluated again by Dr. Boerger in November 2005.  (Tr. 426-32). Dr. Boerger reported that Plaintiff was cooperative, complained of pressure in her head which she said was worse since undergoing the DHE protocol, had an appropriate affect, and that she tried to keep busy with church work and visiting friends.  (Tr. 426-35).  Dr. Boerger also reported that Plaintiff was alert and oriented, appeared to be aware of her health and emotional problems, had a history of panic attacks that appeared to be controlled with medication, and that he did not see any behavior which would be suggestive of malingering.  *Id.*  Dr. Boerger noted that Plaintiff's diagnoses were panic disorder with agoraphobia, depressive disorder NOS, and pain disorder associated with both psychological factors and general medical condition and he assigned her a GAF of 55.  *Id.*  Dr.

Boerger opined that Plaintiff's ability to relate to others, including fellow workers and supervisors was mildly to moderately impaired as a result of depression, anxiety, and irritability, her ability to understand and follow instructions was mildly impaired as reflected in her reports of forgetfulness in day-to-day activities, her ability to maintain attention to perform simple, repetitive tasks was mildly to moderately impaired as a result of depression and anxiety, her ability to withstand the stress and pressures associated with day-to-day work activity was mildly to moderately impaired based solely on her psychological symptoms, and that her ability to tolerate stress was likely to be more impacted by her headache pain. *Id*. Dr. Boerger reported further that Plaintiff had slight limitation in her ability to understand and remember short, simple instructions, carry out short, simple instructions, and make judgments on simple work-related decisions. *Id.* Dr. Boerger also reported that Plaintiff had moderate limitation in her ability to understand, remember, and carry out detailed instructions, interact appropriately with others, respond appropriately to work pressures in a usual work setting, and respond appropriately to changes in a routine work setting. *Id.*

Plaintiff continued to receive treatment from Dr. Studebaker during the period September, 2004, through October, 2005. (Tr. 467-79). In addition, Plaintiff continued to receive mental health treatment from Dr. Ashbaugh during the period May 23, 2005, through January 9, 2006. (Tr. 480-83).

Plaintiff consulted with neurologist Dr. Gretter on June 12, 1006, who reported that Plaintiff complained of constant headaches with or without medications. (Tr. 498-506). Dr. Gretter essentially reported that Plaintiff's examination was normal and he identified Plaintiff's diagnoses as chronic daily headaches, questionable transformed migraine. *Id.*

In her Statement of Errors, Plaintiff alleges that the Commissioner erred in his assessment of treating physician opinion and his evaluation of the medical evidence, specifically as to his consideration of her headaches and mental impairments. (Doc. 7). Plaintiff also alleges that the Commissioner erred in his evaluation of her credibility. *Id.*

In general, the opinions of treating physicians are entitled to controlling weight. *Cruse v. Commissioner of Social Security*, 502 F.3d 532, 540 (6th Cir. 2007), *citing, Walters v. Commissioner of Social Security*, 127 F.3d 525, 529-30 (6th Cir. 1997) (citing 20 C.F.R. § 404.1527(d)(2) (1997)). In other words, greater deference is generally given to the opinions of treating physicians than to those of non-treating physicians. *Rogers v. Commissioner of Social Security,* 486 F.3d 234, 242, (6th Cir. 2007), citing *Wilson v. Commissioner of Social Security,* 378 F.3d 541, 544 (6th Cir. 2004). "A physician qualifies as a treating source if the claimant sees her 'with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition.'" *Cruse,* 502 F.3d at 540 (alteration in original) (quoting 20 C.F.R. § 404.1502). However, a treating physician's statement that a claimant is disabled is of course not determinative of the ultimate issue. *Landsaw v. Secretary of Health and Human Services,* 803 F.2d 211, 213 (6th Cir. 1986). A treating physician's opinion is to be given controlling weight if it is well supported by medically acceptable clinical and laboratory techniques and it is not inconsistent with the other substantial evidence in the record. *Cutlip v. Secretary of Health and Human Services,* 25 F.3d 284 (6th Cir. 1994).

The reason for the "treating physician rule" is clear: the treating physician has had a greater opportunity to examine and observe the patient. *See, Walker v. Secretary of Health and Human Services,* 980 F.2d 1066, 1070 (6th Cir. 1992). Further, as a result of his or her duty to cure

the patient, the treating physician is generally more familiar with the patient's condition than are other physicians.  *Id.* (citation omitted).

While it is true that a treating physician's opinion is to be given greater weight than that of either a one-time examining physician or a non-examining medical advisor, that is only appropriate if the treating physician supplies sufficient medical data to substantiate that opinion. *See, Kirk v. Secretary of Health and Human Services,* 667 F.2d 524 (6th Cir. 1981), *cert. denied,* 461 U.S. 957 (1983); *see also, Bogle v. Sullivan,* 998 F.2d 342 (6th Cir. 1993).  A treating physician's broad conclusory formulations regarding the ultimate issue of disability, which must be decided by the Commissioner, are not determinative of the question of whether an individual is under a disability.  *Id.*  Further, the Commissioner may properly reject a treating physician's opinion if it is not supported by sufficient medical data or if it is inconsistent with the other evidence of record. *Cf., Kirk, supra; see also, Walters, supra.*

Plaintiff seems to challenge the Commissioner's weighing of the evidence related to her headaches as well as her alleged mental impairment.  Indeed, Plaintiff characterizes Judge Padilla's opinion as a "melodramatic interpretation" of the evidence.  Nevertheless, this Court notes that it is, of course, the Commissioner's function to weigh the evidence.  *Young v. Secretary of Health and Human Services,* 787 F.2d 1064 (6th Cir.), *cert. denied,* 479 U.S. 990 (1986).  Social Security matters not uncommonly involve the situation of conflicting medical evidence and the trier of fact has the duty to resolve that conflict.  *Cf., Richardson v. Perales,* 402 U.S. at 399; *see also, Mullins v. Secretary of Health and Human Services,* 836 F.2d 980 (6th Cir. 1987).

The Court will first address Plaintiff's alleged mental impairment.

First, the Court notes that in spite of Plaintiff's strenuous objection to Judge Padilla's finding that she has a history of polysubstance abuse, the record adequately supports that finding. For example, the record indicates that during a September 9, 2001, emergency room visit, Plaintiff herself refused to take narcotic medication because of her self-reported "previous addiction problem.". (Tr. 170). In addition, Plaintiff testified at the hearing that at one time she was an alcoholic, (Tr. 49), and she reported to Dr. Boerger that she has a history of alcohol abuse and marijuana use. (Tr. 427; 431). Under these facts, there is nothing erroneous about the Commissioner's finding that Plaintiff has a history of polysubstance abuse.

Turning to Plaintiff's alleged mental impairment, Judge Padilla rejected Dr. Ashbaugh's opinion the bases that Dr. Ashbaugh did not support his opinion with any objective medical evidence or clinical findings and that it was inconsistent with the other evidence of record. (Tr. 29-30).

As noted above, Dr. Ashbaugh essentially opined in 2004 that Plaintiff had good ability to relate to coworkers, maintain personal appearance, and understand, remember, and carry out simple job instructions and a fair ability to follow work rules, deal with the public, use judgment, interact with supervisors, deal with work stresses, function independently, maintain attention/concentration, behave in an emotionally stable manner, relate predictably in social situations, understand, remember and carry out complex job instructions, and understand, remember and carry out detailed, but not complex, job instructions. Dr. Ashbaugh also reported that Plaintiff had poor or no ability to demonstrate reliability. In offering his opinion, the only information Dr. Ashbaugh referred to was his opinion that Plaintiff had poor concentration, trouble focusing, and poor frustration tolerance related to depression and a closed head injury. (Tr. 375-77).

14

A review of Dr. Ashbaugh's office notes reveal that they contain few objective clinical findings. For example, in March, 2005, Dr. Ashbaugh described Plaintiff as doing fairly well. (Tr. 414). In May 2005, Plaintiff stated that she did not think that she was doing too bad. (Tr. 483). Dr. Ashbaugh noted that she was staying sober, (Tr. 483), and he assigned GAF scores of 52, 53, 54, 56, 57, 58, indicating, at most, only moderate symptoms, (Tr. 387-90, 414-16, 480-83). These progress notes also primarily reflect situational stressors and Plaintiff's concerns about her daughter and son, her mother's illness and death, financial problems, and the denial of disability applications. (Tr. 387-90, 414-16, 480-83).

In addition to not being supported by objective clinical findings, Dr. Ashbaugh's opinion is inconsistent with the other evidence of record. For example, examining psychologist Dr. Boerger reported that Plaintiff's ability to relate to others, including fellow workers and supervisors was only mildly to moderately impaired as a result of depression, anxiety, and irritability and he thought her ability to understand and follow instructions was only mildly impaired. Dr. Boerger also determined that Plaintiff's ability to maintain attention to perform simple, repetitive tasks was only mildly to moderately impaired as a result of depression and anxiety. Finally, Dr. Boerger opined that Plaintiff's ability to withstand the stress and pressures associated with day-to-day work activity was, at worst, mildly to moderately impaired. (Tr. 426-32). Further, Dr. Ashbaugh's opinion is also inconsistent with the reviewing psychologist's opinions. See Tr. 244-59.

Under these facts, the Commissioner did not err by rejecting Dr. Ashbaugh's opinion or by finding that Plaintiff is not disabled by her alleged mental impairment.

As noted above, Plaintiff also challenges the Commissioner's analysis of her headaches. Essentially, Plaintiff claims that the Commissioner erred by failing to find that her headaches are of a disabling nature.

First, and perhaps foremost, the Court notes that Plaintiff's own treating physician, Dr. Studebaker, reported that his opinion is that Plaintiff is *not* disabled. (Tr. 349). While Dr. Studebaker suggested that Plaintiff may be disabled because Plaintiff considers herself disabled, that is simply a legally insufficient reason for an award of SSD. As the Court's review of the relevant medical evidence shows, *supra*, there are very few, if any, clinical objective findings in the record which support a finding of a disabling impairment. For example, neurologist Dr. Kitchener reported that Plaintiff had, as worst, "significant tenderness" in the paracervical and shoulder muscles. In addition, Dr. Kitchener, Dr. Udrea, and Dr. Gretter, all neurologists, reported that Plaintiff's neurological examinations were normal, and Dr. Smith noted, at worst, diffuse tenderness to palpation over the cervical neck and occipital and trapezius muscles. Further, Plaintiff's EEG was normal and the other objective test results, specifically MRIs, showed only mild cervical findings.[1]

Plaintiff's final challenge to the Commissioner's decision is that he erred by rejecting her allegations of disabling pain.

There is a two-step process for evaluating pain. First, the individual must establish a medically determinable impairment which could reasonably be expected to produce the pain. *See, Jones v. Secretary of Health and Human Services,* 945 F.2d 1365 (6th Cir. 1991), *citing, Duncan v. Secretary of Health and Human Services,* 801 F.2d 847 (6th Cir. 1986). Second, the intensity and

---

[1] Although Plaintiff's brain MRIs indicated the presence of white matter hyperintensities, no physician of record associated those findings with Plaintiff's allegations of headaches.

persistence of the alleged pain are evaluated by considering all of the relevant evidence. *See, Jones,* 945 F.2d at 1366-70.

The measure of an individual's pain cannot be easily reduced to a matter of neat calculations. *Jones, supra.* There are no x-rays that can be taken that would objectively show the precise level of agony that an individual is experiencing. *Id.* Hence, in evaluating the intensity and persistence of pain, both physicians and laymen alike, must often engage in guesswork. *Id.* The Commissioner's own guidelines acknowledge the most inexact nature of this evaluation:

> Medical history and objective medical evidence such as evidence of muscle atrophy, reduced joint motion, muscle spasm, sensory and motor disruption, are usually reliable indicators from which to draw reasonable conclusions about the intensity and persistence of pain and the effect such pain may have on the individual's work capacity. Whenever available this type of objective medical evidence must be obtained and must be considered in reaching a conclusion as to whether the individual is under a disability.

*Jones,* 945 F.2d at 1369-70, *quoting* S.S.R. 88-13.

For the same reasons that the Commissioner did not err in his analysis of the evidence as to Plaintiff's impairments, he did not err by rejecting Plaintiff's allegations of disabling headache pain. Specifically, the medical evidence contains few, if any, objective clinical or test findings which support Plaintiff's allegations. In addition, Plaintiff's self-reported activities are inconsistent with her allegations of disability. For example, Plaintiff reported to Dr. Boerger that she keeps busy doing church work and visiting friends. Plaintiff also reads, shops, attends church functions, watches television, cares for her pet, does laundry, cooks, drives, studies the Bible, performs household chores, and pays bills. Further, Plaintiff has no side effects from any medications she takes. (Tr. 48).

17

Under these circumstances, the Commissioner did not err by rejecting Plaintiff's subjective complaints and allegations of disabling pain.

Our duty on appeal is not to re-weigh the evidence, but to determine whether the decision below is supported by substantial evidence. *See, Raisor v. Schweiker,* 540 F.Supp. 686 (S.D.Ohio 1982). The evidence "must do more than create a suspicion of the existence of the fact to be established. ... [I]t must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." *LeMaster v. Secretary of Health and Human Services,* 802 F.2d 839, 840 (6th Cir. 1986), *quoting, NLRB v. Columbian Enameling & Stamping Co.,* 306 U.S. 292, 300 (1939). The Commissioner's decision in this case is supported by such evidence.

It is therefore recommended that the Commissioner's decision that Plaintiff was not disabled and therefore not entitled to benefits under the Act be affirmed.

August 5, 2008.

                                                      s/ **Michael R. Merz**
                                                Chief United States Magistrate Judge

J:\Social Security - Drafts\Price_SSD&SSI.wpd

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed.R.Civ.P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten days after being served with this Report and Recommendations. Pursuant to Fed.R.Civ.P. 6(e), this period is automatically extended to thirteen days (excluding intervening Saturdays, Sundays, and legal holidays) because this Report is being served by one of the methods of service listed in Fed.R.Civ.P. 5(b)(2)(B), (C), or (D) and may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond

to another party's objections within ten days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See, United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).